Good morning, Your Honors. Susan Horner for the Appellant Hodjati. I did give the clerk a copy of the updated site. I'd like to reserve four minutes for rebuttal. Our briefs in this case are quite detailed in terms of both the overview of what I view as some of the errors by the court. Some are factual and some are more legal. First of all, the court erred through inadequate support for major findings it made through factual inaccuracy. And by that, I'm referring to the MMSE, the first MMSE that the court attributed first to April 2, 2012, which is correct, and then May 2, 2012, which is correct, and then May 3, 2012, which is correct. But he did look at Dr. Mendelson's report that critiqued the Dr. Horn report, and Dr. Mendelson gets the time frame correct, does she not? She does, but she also says that the decline was not explained. She doesn't criticize it, but she does say it was not explained. Well, isn't that the district court's... I guess what I'm probing here is whether or not this is really a significant error by the district court, given the fact that he essentially credited Mendelson's critique of the Horn report, and one of Dr. Mendelson's concerns was there is this significant seven-point drop in a very short period of time that really isn't explained by Dr. Horn, or consistent with the observations of the other doctors who examined your client. Well, it definitely was accepted as a valid... First of all, Dr. Horn states that it was valid, right in her assessment indication of his capability. But I thought Dr. Mendelson's criticism was that those conclusions were not validated, that she didn't... Dr. Horn didn't adequately explain why her results were reliable. And that was never asked of Dr. Horn. Dr. Horn performed a clinical neuropsych exam. Those kind of tests are usually done in the forensic exam, such as in workers' comp, when you have a legal action. Well, let me make sure I understand what Mendelson was talking about. I thought what the criticism was, was there was no showing in the report of the inherent validity of the test results. Well, and... But she didn't explain what test results. There's... I've not heard of any particular effort test applied to discredit an entire neuropsych exam. Now, there may be that there's a validity test that applies to one or another of the domains, but to trash the entire detailed one didn't make sense. And there was no explanation there, so it was sort of... How about the more significant concern that the treatment notes and observations of the physicians who'd been examining your client over an extended period of time didn't corroborate Dr. Horn's conclusions, which is what I understood Dr. Mendelson... Mendelshohn, how was he pronounced? Didn't corroborate in what way? That they didn't reflect the kind of symptoms and observations that would be consistent with her diagnosis. That's what I understood the criticism... Okay, if you look closely at the medical records, they thought, all of them, up until the neuropsych exam was ordered, to find out the basis of the cognitive, whether it was depression, whether it was something else. They all attributed the loss of concentration and focus and resulting memory issues to constant, severe daily headaches. That's very apparent in all of their statements. There's no functional test. Your client's claim wasn't ever based on headaches, or at least as I understand it, they're saying this claim wasn't based on headaches, it was based on memory loss and some kind of more like dementia symptoms. So there seems to be a mismatch between your jump to the headaches. Can you respond to that point? Absolutely. What was presented to the court was all of the medical records, every single medical note, and every single medical note makes it very clear that because of his daily severe recalcitrant, non-responsive to medications headaches, and what they thought was the resulting inability to focus and concentrate on work, he couldn't work. I mean, imagine trying to go to work every day and have non-stop, severe to where they're unbearable headaches all day long and then try and run a business. And that was explained by Dr. Baer in his APS. It was in a couple of his notes. And did the Horn tests confirm the headaches? Because I didn't really understand that they did, that Horn finally does tests that seem to show a problem that hadn't shown up in any tests that had been ever given before. Do those tests relate to the headaches, or is it really two different conditions? She was, a neuropsych test is not done for headaches. It has no place in migraine assessment, except for that people with migraine, as you recognize from the Leetzau case that I just submitted, and the Hegarty case, another case that we cited. People with constant severe headaches can't focus and concentrate on what they're doing. And as a result, they don't remember things. What her job was to do was to assess the nature of the cognitive deficits, how bad they were, and what they were from, because you can tell from a neuropsych evaluation if the cognitive problems are more organic based, or whether they're depression based, or whether they probably arise from the headaches. And she determined that the memory issues, and that doesn't mean that the focus and concentration still isn't affected by the headaches, but the memory issues were definitely deficient, and had become probably more deficient over time. And she diagnosed that as organic brain disease of a dementing process. And was that the first time that there were tests that you can say validated a diagnosis? Of dementia? Of anything, really. Like, had there been tests that validated the headache complaints? When he was, yes. But there aren't tests. When you develop severe headaches, you do test first to rule out an organic cause that is not. Like a brain tumor, right? Like a stroke, an aneurysm, hydrocephalus, a bleed, ischemia, and the CT ruled those out. He didn't have those. So then Dr. Baird kept trying... And they read it, the test results were otherwise normal. That's correct. At the conclusion. Right. So to answer Judge Friedland's question, where in those tests, if anywhere, is there confirmation of the migraines? That came with Dr. Nazareth. And when Hojati was not responsive to any of the medications which typically are used to treat headaches and migraine, the question was, okay, so what are these things? So Dr. Baird, the pain medicine guy, sent him over to the neurologist, and Nazareth documented the various types of symptoms that he had, because migraines are clinical, and there are a certain number of symptoms that you have to have out of a list. And from his medical knowledge, he didn't, I don't think he wrote down every element or factor that one considers, but he looked at were there, you know, the severity of them, and yes, they were at least moderate to severe, they were severe. Did you argue in the district court that the basis for disability was the headaches? Yes, at the very beginning of the brief, it mentioned the fact that he was disabled by the severe headaches with the cognitive issues, and then it went on more to the cognitive issues because they were finally identified as not arising from the headaches, but both of them made him unable to focus and concentrate on his work. What evidence is there in the record that even if we credit Dr. Horn, for example, that the disability was so severe that he couldn't do the specific job that he was working at? Well, first of all, he's not a cashier, and he's not an inventory stocker. He has to run a three-part business with all of the business planning, all of the negotiation of financial contracts, and he did that in-state, out-state. He couldn't travel. He presented information about some of his failures at work, which included he began writing checks in the wrong amount. He was untimely in his checks, so you have a time orientation problem. You have a location orientation problem. Most, if not all, that was his own testimony, wasn't it? Right, and they didn't ask for anything more. I mean, I'm sure he would have been happy to submit it, but Aetna asked for nothing. Why could he have submitted, though? Because his doctors, it seems, couldn't really pin down what the problem was. So it seems different than the cases you're citing in which the insurer ignores something that's in the medical records. Here, even the doctors didn't really know what was happening, right? Well, the doctors knew he had constant severe headaches. That's not the question. The question is were they able to identify a definitive diagnosis, and I share the same concern Judge Friedland has that, you know, in looking at those notes and those reports, this really was a medical mystery in terms of what was truly causing your client's headaches. Well, there is no doubt that he had, by every report that he gave, constant, severe, intractable headaches, and that is an abnormal entity. It differs from the normal body state, and that fits right within the definition. The definition of illness is a pathological condition, pathological or pathology is not defined, of the body that presents a group of clinical signs and symptoms and lab findings. The lab findings are always normal for migraine. If they weren't, they would have identified another pathological state. So the lab findings were the normal findings, which rules out anything else. The symptoms were classic for migraine. He did not have every one of them, but he had the sufficient number to meet the factors of migraine. He did not have aura, the visual difficulties that are typical of an aura, and therefore he was diagnosed not only with migraine, but very specifically with common migraine, not classic migraine. The district court seems to have understood this claim to be based on memory loss or some kind of dementia, not on the migraines and pain. You say that it was mentioned in the brief, but can you point us to where we can find the argument made well enough that we should view it as having been preserved in the district court? Okay, two parts to that question from what I heard is the district court said, I think the district court accepted migraine, but then said there has to be another diagnosis, you can't be disabled from migraine alone. And that is when you've got someone with constant severe migraines every day, that's illogical. I mean, imagine yourself coming to work every single day. Do you present to any of the physicians with a migraine on the day they examined him? I didn't see any treatment note to that fact. It doesn't say, but it suggests so, because one of the side effects of migraine is neck pain. He had neck pain four or five times. With neck pain, at examination it was found and his neck pain was reported to be at the back of the neck up into the back of his head. You wanted, I'm sorry, you wanted to save four minutes and you're down to 1.45. Would you like to reserve that? I better do that. Okay, fair enough. Thank you. Let's hear from him. Good morning, Your Honors. Matt Kleiner on behalf of the appellees. The issue before us today is the district court was charged with the responsibility of deciding a Rule 52 motion, and the district court's role in doing so is essentially to conduct a bench trial and on the record evaluate the persuasiveness of conflicting testimony and decide which was more likely true. In discharging that responsibility, the district court, based on a thorough review of the record, ruled in Aetna's favor and concluded that Mr. Hajati had not met his burden under the plan. The primary issues that are now being raised go to the district court's credibility determinations based on those factual findings as well as to discretionary rulings made by the district court. Here the district court did not commit any type of a clear error, which would be a required finding based on the credibility issues discussed, or abuse its discretion in ruling on the evidentiary rulings. I'd like to give just a general overview with respect to the evidence that was presented and what the district court was faced with. The district court was faced with eight and a half months of records from the treating physicians, and in those eight and a half months of records there is no objective evidence that Mr. Hajati was enduring any type of subjective pain. All of the evidence is based on his self-reported statements. What test could there have been of pain? If you compare it to the decision that was submitted after the fact, the Letzlo decision, it gives you a very stark contrast between what could have been presented and what was presented here. In our case, we don't have any evidence other than the self-reported complaints of pain. In the Letzlo decision, you have a history of migraines that began when the plaintiff in that case was 21 years old, going all the way through the disability claim. You have a history of her going through all sorts of different medications, I think seven or eight different medications, including steroids, Botox injections, 30 Botox injections in the face. You have a history of absenteeism prior to the disability claim being submitted, and you contrast that to Mr. Hajati, whose first doctor's note or medical record that's in our record is September 8th, which is six days after he submitted his disability claim. Then going back, comparing that to the plaintiff in Letzlo who missed all kinds of work prior to submitting the disability claim. It seems like part of his very problem is he's not allowed to miss work until he can actually be proven to be disabled. He stopped working because he says he felt like he couldn't work, and then eventually he gets tests that show he really has a problem. But there's this gap in between where perhaps he's perceiving problems that the doctors can't detect, and eventually they do detect them. It seems like the way your plan is written, you need to be able to prove that you're disabled from the very day you stop work. You can't have this sort of gradual decline. Am I understanding the policy correctly in that way? That is correct. So the day that you submit your disability claim and you're off of work is your first day of disability, and that's the day that you have to be able to show that you are in fact disabled. And if you can't show that that day you had the test, but a week later you have the test, you're going to lose under this plan. Is that right? No, not necessarily. So if you have a test a week... Something was an elimination period before you start paying benefits. That's correct. But the elimination period doesn't start until you're determined disabled, isn't that right? You have to show that you are disabled throughout the elimination period in order to receive disability benefits. So basically, you have to be able to prove that you are disabled from the very first day that you decided, I can't go to work today. No, not necessarily. You have to be able to show through medical evidence, clinical findings, etc., as required by the plan, that you are disabled as of September 1st. So if your test didn't occur until October 1st, and that's what showed disability, and that test was able to go back and say as of September 2nd, when he was, the first day he missed work, he was actually disabled as of that date, then you would have met your burden under the plan. But if you have a condition that causes a gradual decline, won't it often be the case that the tests don't show it until later, and there's some ambiguity about exactly when it got bad enough? In circumstances where you have a gradual decline, the issue is when does the person become disabled. And so if you look at the record before us, it's not until Dr. Horn's report was submitted, which is almost a year after the disability claim had initially been submitted, that there's this organic brain disease kind of diagnosis that is being put out there. As of two months earlier, as of Dr. Nazareth's reports and the tests that he had run, everything was normal. And so from a medical standpoint, prior to that date, all the way to the date that he originally submitted his claim for disability, there's no evidence to show that he was disabled during that period. Had anyone done the tests that Dr. Horn did, though? There were different tests, right? There were different tests, and no one had to—well, let me back up. Dr. Nazareth ran the same MMSE test that was completed, and it showed a normal result. And one of the concerns and the criticisms of Dr. Horn's report was that MMSE report that was done was normal by Dr. Nazareth, and then just a short time later, there was a finding that it was a severe drop in that finding, which was unexplained. And Dr. Mendelsohn pointed out that Dr. Horn didn't explain why there was such a significant drop in such a short period of time. And you can see why that's important from the disability carrier's perspective, is because they need to know, going back to the date that he left work, and if you're going to pay benefits to that person for missing work during that period of time, that he was in fact disabled back then. But he doesn't even have the option of saying, okay, don't pay me benefits for the year. Start paying me from the Horn tests onward. That's not an option under this plan, right? He has to be disabled on the first day he misses work. I don't know what Mr. Hojjadi's current status of work is, and if he's still employed, and what the effect of his benefits are. I don't know if he has the option of submitting a claim based on the disability now. It depends on if the policy's still in effect. But based on the claim that he submitted... But that would have to be based on some other job or some new work. It can't be based on his working for a long time and paying into this plan, and then if he stops work before the test can actually confirm that he's disabled, he's out of luck, right? Unless he somehow is able to work again, despite what seems now to be quite a serious condition. Unfortunately, I don't have all the facts to answer that question, but I think if he is still covered under this plan, he could submit a new claim. Well, what would make him covered under this plan? What would be the facts that would help you answer that? Employment, for example. But so he would need to be able to work again, despite the decline that's getting worse. All of a sudden, now he needs to be able to work again? No, he could still be employed at his employer. I don't know if he is, based on the record before us. I don't know if he is still employed. He could be on a medical leave, for example. He could then submit a new claim for disability based on his claim as of Dr. Horn's report going forward, if that's the case. If the company didn't have such an ability to keep him on staff for that period of time and he's no longer working, then... The disability requires a combination, does it not, of a drop in income plus inability to work? Correct. There's a minimum income requirement. Like 80% or something like that? Yeah, I think it's 80% for the first part and then drops to 60% or I could have that backwards, but there is a minimum income requirement. So unless the company put him on some kind of, I don't know if light duty is even the right word, but some sort of maybe leave without pay or something, and he could show the drop in income and then a later definitive diagnosis, assuming that the plan was still in effect, then he might be able to submit a supplemental claim or a new claim for disability? That would be my understanding, Your Honor, yes. Because that's the way Social Security disability works. You may not be able to establish the date of onset as early as you want, but if later it becomes clear that you are in fact disabled, you can submit a new claim. Right, and I don't know if you had mentioned... But in order to submit a new claim for this, he has to be working full-time? Is that right? I thought to be covered, he had to be working full-time, which would be different than... No, because you can't be working full-time if he's out on disability. If he's been paid full-time, because then he wouldn't meet the drop in income, right? Maybe full-time isn't quite right, but the coverage provisions, do the coverage provisions not apply? I have to pull them up, but it was something like 80% time, or it was quite a lot of work that required you to be covered by this plan, I thought. Yeah, I mean, essentially, you have to be at the current time when you're claiming your disability claim. You can't have been working at that point in time, and you can't have been making a certain amount of... a minimum amount of money during that time frame, because if you were, you wouldn't qualify. But immediately before that, so maybe I wasn't clear about the question. I think you're saying he could make a new claim if he was working right before he makes the new claim. Is that correct? No, I'm saying if he's still employed, and that's where I'm drawing, I think, the distinction, maybe that's where the confusion is. He may still be employed by ADP. He may not be working for ADP, and if he's still employed and still covered under the plan, then there is a possibility, and again, I don't have the facts in front of me, Well, he doesn't work for ADP, does he? I thought he worked for a cellular company. Correct. ADP is just the payroll, and it's sort of their HR department for the employees of the cellular phone company. Right, so with respect to whoever his employer is, if he is still employed with that employer, not necessarily working, he could submit a claim for disability. So, I mean, for example, if... It does seem a bit of a catch-22 because if he's the manager of the store and he can't work because of the headaches or the dementia, then it's unlikely that he's going to be continued in the employment as the store manager. So it does seem that by the time he gets a definitive diagnosis, he's just out of luck. It depends on the facts of that. But, I mean, there is a potential where if the employer no longer had that person and terminated the in-person because they weren't able to work and he was no longer covered. Well, it sounds like he never went back to work, based on what I could tell from the record. That's my understanding, yes. But so you're saying if instead of terminating him because he can't work anymore, they just continue to call him an employee at that point? If he's not making any money because he's not working, would he continue to pay into the plan? What would it look like to continue on with coverage if you're not working? It's a good question. And, again, I'm talking... Somebody would have to pay the disability insurance premium, right? Yeah, the employer would still have to keep them. And I don't know how this works because it's far outside my realm. But what my kind of expectation would be would be if they had some type of medical leave, for example, where you go off and they're no longer paying your salary, but you're still going to keep your insurance benefits and retirement benefits and everything like that. At that point, he's clearly going to meet the cut in income requirement. The question is, is he still employed? Correct. Does the plan make clear that you need to have that kind of capacity? I mean, would he have known that he needed to ask the employer to not terminate him but create some kind of medical leave for him so that he could eventually test badly enough to qualify? The plan does have provisions that relate to when your coverage ends. And one of those points is if your employment ends. And there's a whole section on that. So, yes, the plan does clarify as to how long this plan is available and those benefits are available to the claimant. But the record doesn't tell us whether he was terminated or ended employment with this particular employer? Not to my understanding, Your Honor. Okay. I wanted to just point out real quickly with the MMSE report, there's an argument that there was an error made by the judge in this one-month kind of decision. And I just wanted to hit on the fact that in Dr. Nazareth's report, there's two treatment visits. One was from April. One was from May. And in his report, he specifically says that he gave him an MMSE exam on that particular day. If you go back and look at it, it does look like Dr. Nazareth cut and pasted everything and put from the first into the second. But I think from that, you can logically infer that when Dr. Nazareth saw Mr. Hojjadi on the second visit, everything was the same. The status was the same. Either he felt that he didn't need to do another test because he thought the results would be the same, but he would and should have noted a significant change if there was anything different. Moreover, as Your Honor had pointed out earlier, the court's conclusion is based on Dr. Mendelson's analysis. And Dr. Mendelson correctly had the time period as to when the first time the MMSE report was done as well as when Dr. Horn had done the report. And then finally, just to end up with respect to the abuse of discretion and the evidentiary rulings as to the 2013 MRI and the Dr. Fiske declaration, those documents ultimately don't add to the analysis. The district court correctly went through the analysis in terms of why it had excluded those, and it's, again, abuse of discretion, and there's nothing to show in the evidence that there was an abuse of discretion. And if you tie in the elimination period argument and the fact that he has to show that he was disabled as of the date he left work on September 2nd, the 2013 MRI and Dr. Fiske's examination ultimately aren't relevant to that analysis. So unless Your Honors have any questions for me, the appellees submit. So I guess I've got to talk fast. So was he terminated by the employer? Mr. Hojati has severe Alzheimer's. He does not know his family. He does not know any friends. He is unable to learn anything. Was he terminated by the employer? And if so, do you know when? Well, he was the employer, but he owns the company and manages it, and it's a three-business company all covered under the ADP. So he could not go back to work because not only that. If he's the owner, he wasn't terminated. No, but he's not working. We're trying to figure out if he can apply again, because it seems like maybe he didn't have the data he needed to support his original claim, but it sounds like he could apply again. He needs to be actively at work. Well, but we just heard that he didn't need to be actively at work, that he could be on medical leave and still apply again. I mean, you can clearly show the loss of income. If you are considered disabled and you go back to work, you're still covered. They have decided he has not been disabled. Therefore, even though he's disabled. But his diagnosis is definitive today, is it not? What's that? Oh, it's been definitive since the neuropsych exam. Which neuropsych exam? The Horn one. But the district court just gave little weight to the Horn report, and we would have to declare that that was clearly a wrong report. The court didn't give weight to it because Mendelsohn had two criticisms. One, he can ride in a taxi, and that was based solely on speculation and conjecture, and speculation and conjecture is not a ground for a reasonable inference. The second thing – Did he tell his treating physicians that when the headaches were too bad, he would take a taxi? Yes, but that's the problem with Mendelsohn's assumption. We don't know when that was, when he would take taxis, if it was between June and end of August 2011 when he was still working, because after that he was at home with his wife who didn't work and could drive him anywhere, and he had two adult sons. What I thought was that if the dementia had developed to the state that Dr. Horn opined, then Mendelsohn said he shouldn't have had the mental faculty to order a taxi cab, make change. I mean, he couldn't even tell Mendelsohn, or excuse me, Horn, what city, what county, what day of the week it was, what time, right? So how could somebody like that get in a taxi and say, take me to Dr. Horn's office? And he couldn't, but that's the problem. Here's a guy with time orientation problems, place orientation problems, and he's reporting what he's always reported. Nobody knows if he was taking any taxis at that time, and if he was, whether his sons or his wife was faxing off to Uber or something, a picture and instructions, but more likely he was taking them back from June to September. There's no information about when, how often, how far, anything. You have to completely speculate on that. So it seems that it's going to be hard for us to sort out this fact dispute about the period of time between when he stopped working and the Horn test, but it seems like he may be able to have a claim sometime after the Horn test if he applies again, according to your opposing counsel. So have you investigated that, and could you? Because it seems like there's possibly some unfairness here that could be remedied if he applied again. Okay. I would absolutely do that, but he is unable to learn anything, no matter how simple. It doesn't matter how many repetitions. He can't even get out of the house. He has severe Alzheimer's. Have you all discussed settlement at all? I came on for the appeal. I don't know what the answer is. The answer is no as far as you're concerned. Not that I know of. Okay. All right. Thank you very much. We're two and a half minutes over. The case disargued is submitted. Thank you, counsel.
judges: Tallman, Friedland, Faber